UNITED STATES of America, Plaintiff

v.

Antoine WATTS, Defendant.

C.A. No. 09–cr–30030–MAP.

United States District Court,
D. Massachusetts.

April 5, 2011.

Alex J. Grant, Paul H. Smyth, United States Attorney's Office, Springfield, MA, for Plaintiff.

Myles Jacobson, Law Office of Myles Jacobson, Northampton, MA, for Defendant.

*MEMORANDUM RE: DEFENDANT'S MOTION REGARDING APPLICATION OF THE FAIR SENTENCING ACT OF 2010* (Dkt. No. 69)[1]

PONSOR, District Judge.

## I. *INTRODUCTION*

The narrow question raised by this pretrial motion is whether, if Antoine Watts is convicted of possessing with intent to distribute five grams or more of crack cocaine, the court will be compelled to impose a minimum mandatory sentence of at least five years on him, or will have the discretion to impose a lower sentence as permitted by the recently enacted Fair Sentencing Act of 2010 ("FSA"). Pub. L. No. 111–220, 124 Stat. 2372 (2010).

The broader question is whether federal trial courts will be required, for roughly the next five years, to perpetuate a congressionally recognized injustice. It is disturbing enough when courts, whose primary task is to *do* justice, become themselves the instruments of injustice, as in the history of our nation it must be acknowledged they sometimes have. But this discomfort reaches its zenith when the injustice has been identified and formally remedied by Congress itself. For a trial judge, the distastefulness of being forced to continue imposing a rejected penalty becomes unendurable in light of the fact that Congress acted partly because the

---

1. To keep this case on track, the court on January 5, 2011, issued its ruling allowing Defendant's motion, with the promise of a memorandum to follow. This is that memo.

injustice is racially skewed and, as everyone now agrees, will fall disproportionately upon Black defendants such as Mr. Watts.

The government's position here is that this court, and all federal trial courts in this country, must robotically continue to impose penalties that all three branches of government—executive, legislative, and judicial—and all elements of our political system-Republicans and Democrats from the most conservative to the most liberal—have now formally condemned as racially tainted and have explicitly rejected as not only unjust but mistaken from the outset. For the reasons set forth below, the affront to manifest and undisputed congressional intent advocated by the government here is not required by law.

A few more introductory words. The government's contention that the General Saving Statute ("Saving Statute"), 1 U.S.C. § 109, demands this result—that is, that the Saving Statute makes perpetuation of obvious injustice a regrettable but necessary expression of respect for the law, however harsh its consequences—cannot survive a close examination of the Saving Statute itself or its legal context. The Saving Statute is simply not the straitjacket the government has tried to tailor.

As will be seen, the case most heavily relied upon by the government for its crabbed interpretation of the Saving Statute, *Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 661, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974), states that when a statute such as the FSA contains a "specific directive" that can be said *"by fair implication* or expressly to conflict with § 109" a court is empowered to hold that the new statute supersedes the Saving Statute. *Id.* at 659 n. 10, 94 S.Ct. 2532 (citing *Great No. R. Co. v. United States,* 208 U.S. 452, 465–66, 28 S.Ct. 313, 52 L.Ed. 567 (1908)) (emphasis supplied). Thirty years after *Marrero,* Justice Scalia,

in discussing whether a new statute superseded a prior one, pungently noted that "[w]hen the plain import of a later statute directly conflicts with an earlier statute, the later enactment governs, *regardless* of its compliance with any earlier-enacted requirement of an express reference or other 'magical password.'" *Lockhart v. United States,* 546 U.S. 142, 149, 126 S.Ct. 699, 163 L.Ed.2d 557 (2005) (Scalia, J., concurring) (emphasis in original).

It cannot be disputed that the situation before the court now is precisely what Justice Scalia described. When the intent of Congress and the interests of justice coincide as exactly as they do with regard to the question of the application of the FSA here, it ill behooves a court (or a prosecutor) to engage in contortions to thwart both. For this reason, elaborated below, the court has allowed Defendant's motion and will consider his sentence in light of the applicable statutes as amended by the FSA.

## II. *FACTUAL BACKGROUND*

It is important to view this case from two perspectives: the narrow context of the specific case, with the government and the defendant seeking justice from the court, and the broader historical and legal landscape that the parties and the court inhabit.

### A. *Antoine Watts*

Antoine Watts was born in 1978 in Springfield, Massachusetts, and has lived here all his life. He, his four sisters and two brothers were raised by their single mother. His father's whereabouts are unknown. Mr. Watts completed the eleventh grade at Putnam High School and received his GED in 2008. Through a temp agency, he worked at a number of local businesses, including the Yankee Candle Company and

Brightside Hospital. Mr. Watts has two sons, ages seven and eleven.

In 1997, at age twenty, Mr. Watts was arrested and convicted of assault and battery on a police officer. (Dkt. No. 6, Karangekis Aff. ¶ 39.) In 2003, he was convicted in the state district court of distributing a Class B substance (cocaine). (*Id.*) At some point, according to the government, Mr. Watts became a member of a Springfield street gang called the Sycamore Street Posse. (*Id.* ¶ 38.) On April 16, 2009, in a sale recorded by audio and video, he allegedly sold less than 28 grams (or one ounce) of crack cocaine to a confidential informant.[2] (*Id.* ¶¶ 37, 39.) In connection with this sale, Mr. Watts was arrested with eight other alleged gang members. (*Id.* ¶ 1.) On October 9, 2009, he pled not guilty and was ordered detained. On October 13, Mr. Watts was released on bond with conditions. The government filed an Information, pursuant to 21 U.S.C. § 851, seeking an enhanced statutory penalty on the basis of Mr. Watts's prior felony conviction. As a result, Mr. Watts's mandatory minimum sentence under the prior law increased from five years to ten years.

Before moving to dismiss the § 851 Information, Mr. Watts moved for discovery regarding the filing of § 851 Informations in federal drug cases in the District of Massachusetts from 2007 through 2009, in an attempt to demonstrate that African-Americans are selectively targeted for the enhanced penalty. (Dkt. No. 44.) This court denied the motion on September 9, 2010, on the grounds that Mr. Watts had failed to meet his burden regarding discriminatory intent. (Dkt. No. 65.)[3] Weeks later, Mr. Watts filed this motion for an order regarding the applicability of the FSA to him. Significantly, under the FSA, Mr. Watts would face no mandatory minimum sentence.[4]

As noted, all the participants in this case approach the issues potentially in play here against a historical and legal backdrop. The discussion will now turn to a necessarily compressed overview of how we all got here.

## B. *The War on Drugs.*

It is a painful, and often noted, irony that the United States of America—the land of the free and the home of the brave—leads the world in the rate of incarcerating its citizens. Some seven percent of the population, or 2.3 million people, are currently housed, at vast expense, in the nation's prisons and jails.[5] Approximately 210,000 inmates are in federal pris-

---

2. Since the case is pending, evidence of the exact amount, apart from the fact that is was more than five grams and less than twenty-eight, is not in the record.

3. However, the court observed a "shocking disparity" between the Western Division of Massachusetts and the rest of the district in the filing of § 851 Informations generally, noting that "a defendant indicted for drug offenses in the Western Division was fifteen times more likely to have an Information filed in his case than a defendant indicted in the Worcester and Boston offices *combined.*" (Dkt. No. 65, at 8.)

4. In reviewing the specifics of this case, it is important to remember that Mr. Watts has

neither pled nor been found guilty; he is presumed innocent and has a trial date of April 25, 2011. It is not clear that he ever will be sentenced. Nevertheless, it is reasonable for him now to ask the court how it will proceed at his sentencing if he should be convicted.

5. The statistics cited throughout can be found at The Sentencing Project, *Incarceration News,* http://www.sentencingproject.org/template/page.cfm?id=107; Federal Bureau of Prisons, Quick Facts, http://www.bop.gov/news/quick.jsp# 1; Bureau of Justice, Sourcebook of Criminal Justice Statistics Online, Table 5.37.2009, *available at* http://www.albany.edu/sourcebook/pdf/t5372009.pdf; Giovanna

ons; of these federal prisoners, 100,000 were convicted of drug crimes.

America's prison population has increased by 500% in the last thirty years, a result almost entirely of an increased determination by state and federal officials to impose lengthy sentences on drug offenders. Part of this initiative included Congress's enactment in 1986 of the Anti–Drug Abuse Act, which established mandatory minimum sentences for drug crimes. As a result, while in 1984, a total of 7,459 defendants pled guilty to or were convicted of violation of drug laws in the United States district courts, by 2009 that number had climbed to 26,612.

In the mid–1980s, NBA player Len Bias's cocaine overdose, a rise in inner-city and gang violence perceived to be due to a rise in the use of a powerful new drug called crack, the alleged "crack baby" epidemic, and an increase in child neglect cases apparently due to parental addiction to crack created a nationwide wave of fear and calls for Congress to act swiftly and harshly to penalize those associated with the sale and use of the drug.[6] The passage of the Anti–Drug Abuse Act, a 192–page omnibus bill that amended the Controlled Substances Act, was called "the most comprehensive, hard-hitting antidrug bill ever written." Sen. Patrick Leahy, 132 Cong. Rec. S 12231 (daily ed. Sept. 10, 1986).

C. *Statutory Mandatory Minimum Sentences.*

The Anti–Drug Abuse Act of 1986 amended the Controlled Substances Act ("CSA") to include mandatory penalties for possession and distribution of cocaine base, or crack. Anti–Drug Abuse Act of 1986, Pub. L. No. 99–570, 100 Stat. 3207 (1986). The theory underlying the penalties in the new statute was that crack cocaine was an inherently more dangerous drug than powder cocaine. It was certainly less expensive and was thought to be fifty percent more addictive. As Senator Patrick Leahy stated in his remarks in support of the bill, "[d]rug merchants are now pushing a new craze that is sweeping the Nation. It's called crack.... One hit costs just $10. Users say addiction can begin after only the second use of crack." Sen. Patrick Leahy, 132 Cong. Rec. S 12231 (daily ed. Sept. 10, 1986).

In this environment, Congress somehow decided to mandate sentences for crack cocaine offenses that were one hundred times more harsh than penalties for offenses that involved cocaine in powder form, despite the fact that the two substances were chemically identical and that powder cocaine could be transformed into crack by anyone with a frying pan and baking soda. The exact origin and rationale of these, in retrospect, grotesque proportions are not entirely known even to this day.[7]

The new statute triggered mandatory minimum sentences according to the weight of the drugs involved, using the 100:1 equation. Thus, a conviction or plea involving five grams (approximately one

---

Shay, *Ad Law Incarcerated,* 14 Berkeley J.Crim. L. 329, 329 (2009).

**6.** Nekima Levy–Pounds, *Can These Bones Live? A Look at the Impact of the War on Drugs on Poor African–American Children and Families,* 7 Hastings Race & Poverty L.J. 353, 356 (2010).

**7.** According to one researcher, Congress came up with the 100:1 ratio by doubling the perceived rate of addiction for crack—fifty percent higher than powder—"for good measure." Michael Coyle, *Race and Class Penalties in Crack Cocaine Sentencing,* The Sentencing Project, *available at* http://www.iamsaam.org/userimages/RaceandClass.Sentencing.pdf.

teaspoon, which represents ten to fifty doses) of crack received the same five-year mandatory imprisonment sentence as a conviction or plea involving five *hundred* grams (approximately two cups, which represents 2500 to 3500 doses) of powder. *See* United States Sentencing Commission, *Report on Cocaine and Federal Sentencing Policy,* 1995. Similarly, convictions or pleas involving fifty grams of crack cocaine or 5000 grams (five kilograms) of powder cocaine each received the same ten-year mandatory *minimum* sentence. The effect of prior convictions on the mandatory sentences was similarly exponential. Possession of five grams or more of crack with one prior drug conviction (including, for example, a marijuana conviction) doubled the minimum mandatory sentence to ten years. Possession of fifty grams of crack with one prior offense doubled the minimum mandatory from ten to twenty years. With fifty grams of crack and two prior drug convictions, the mandatory sentence was life in prison without possibility of parole.

## D. *United States Sentencing Commission.*

Two years prior to the enactment of the Anti–Drug Abuse Act, Congress had established the United States Sentencing Commission ("USSC"), whose primary responsibility was to address disparities in sentencing by developing sentencing guidelines for trial judges.[8] The Anti–Drug Abuse Act authorized the USSC to develop guidelines consistent with the statutory penalties of the Act. As this was well before *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the Guidelines were, essentially, mandatory. The USSC incorporated the mandatory minimums into its guidelines and set penalty ranges for all quantities of the drugs.

### 1. *Judicial Discretion.*

The enactment of mandatory minimum sentences and, at least initially, the promulgation of the Guidelines tightly limited the discretion of district court judges to consider the individual circumstances of the defendants before them in rendering sentences. 18 U.S.C. § 3553 requires that, when considering a sentence, "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with ... the need for the sentence imposed." 18 U.S.C. § 3553(a). With the enactment of the Anti–Drug Abuse Act and the development of the Sentencing Guidelines, judges were required to sentence defendants to specific prison terms, even in cases where the sentence was obviously "greater than necessary." *Id.* The result has been, according to a judge of this district, an "unprecedented and failed experiment in mass incarceration."[9]

Researchers who interviewed a number of judges who had taken senior status since the imposition of the Guidelines reported that

> [f]ederal guidelines have proved to be such a disaster that many judges of senior status, who often can choose the cases they wish to hear, have refused to handle criminal cases because they consider the guidelines so unjust.... As one of them remarked, "The people who drew up these guidelines never sat in a court and had to look a defendant in the

---

8. Hon. Stanley A. Weigel, *The Sentencing Reform Act of 1984: A Practical Appraisal,* 36 UCLA L. Rev. 83 (1988).

9. U.S. District Judge Nancy Gertner, *Confronting the Costs of Incarceration: Supporting Advisory Guidelines,* 3 Harv. L. & Pol'y Rev. 261, 261 (2009).

eye while imposing some of these sentences." [10]

In their decisions, district court judges made known the heavy toll of the Guidelines and particularly the 100:1 crack-to-powder-cocaine ratio. *See, e.g., United States v. Clary*, 846 F.Supp. 768, 772 (E.D.Mo.1994) ("The '100 to 1' ratio, coupled with mandatory minimum sentencing provided by federal statute, has created a situation that reeks with inhumanity and injustice."); *United States v. Patillo*, 817 F.Supp. 839, 842 (C.D.Cal.1993) ("I, for one, do not understand how it came to be that the courts of this nation, which stood for centuries as the defenders of the rights of minorities against abuse at the hands of the majority, have so far abdicated their function that this defendant must serve a ten year sentence."); *United States v. Fiterman*, 732 F.Supp. 878, 885 (N.D.Ill. 1989) ("Federal law mandates severe sentences in drug cases. As a result, families suffer financial, emotional and nurturing deprivations. It is a rare case where such hardships are not suffered."); *United States v. Hayes*, 703 F.Supp. 1493, 1495 (N.D.Ala.1989) ("[T]here are admittedly certain elements in this situation which can validly be described as unfair ... such 'unfairness,' if it exists, does not release me, and cannot deter me, from imposing on ... defendants what I find to be the minimum sentence mandated by Congress.").

Beyond the excessiveness of the sentences mandated by the new law, many judges began to comment on its racially biased impact. Crack cocaine use, it emerged, appeared predominantly in black communities, whereas powder cocaine appeared more often in white neighborhoods. *See, e.g., United States v. Dumas*, 64 F.3d

1427, 1432 (9th Cir.1995) (Boochever, C.J., concurring) ("Although I find the result in this case to be shocking, in that the punishment for the crack cocaine offense is the same as the punishment that would have been imposed for a comparable offense involving 100 times as much powder cocaine, and the evidence indicates that 92% of federal prosecutions for crack cocaine, which require the enormously higher terms of imprisonment, involve African–Americans, I am compelled to concur.").

2. *USSC Recommendations to Amend the Ratio.*

a. *1995.*

District court judges were not the only group calling attention to the unfairness of the sentencing disparity. The USSC itself issued a report in February 1995 with staggering findings about the racial impact of the mandatory minimum sentences. The USSC found that in 1993, 88.3% of the offenders in federal court for crack-related crimes were Black and 7.1% were Hispanic. USSC, *Report on Cocaine and Federal Sentencing Policy*, 1995. Furthermore, the mandatory minimum penalties were most often applied to low-level dealers. In describing the irrationality of the 100:1 rationale, the USSC noted that "the 500–gram quantity of powder cocaine that can send one powder cocaine distributor to prison for five years can be distributed to up to 89 different street dealers who, if they chose to turn it into crack cocaine, could make enough crack to trigger the five-year penalty for each defendant." *Id.* In its recommendation, the USSC expressly rejected the ratio as incommensurate with the dangers and harms inherent to "two easily convertible forms of the same drug." *Id.*

---

**10.** Alexander B. Smith and Harriet Pollack, *Curtailing the Sentencing Power of Trial*

*Judges,* 66 Court Review 4 (1999).

### b. *1997.*

Congress took no action on the USSC's recommendation but directed it to submit specific recommendations to the statute and Sentencing Guidelines. In 1997, the USSC issued a special report to Congress in which it recommended that Congress reduce the five-year mandatory sentence for powder cocaine to between 125 and 375 grams and increase the five-year mandatory sentence trigger for crack cocaine to between twenty-five and seventy-five grams. USSC, *Special Report to the Congress: Cocaine and Federal Sentencing Policy* 2, 1997. In addition to reciting statistics demonstrating the racial disparities and the inherent unfairness of the mandatory minimums, the report noted that

> [t]he current policy has little or *no* impact upon the drug abuse problem. The jails are full. Drug abuse is a more significant problem than it was when Congress in 1986 adopted mandatory minimum penalties.

*Id.* at 3 (emphasis in original). Despite these well-supported findings, Congress again declined to act upon the USSC's recommendations.

### c. *2002.*

In 2002, the USSC again issued a report to Congress in which it again spelled out its findings that the mandatory minimums exaggerated the relative harmfulness of crack and the seriousness of most crack offenses, penalized most harshly low-level offenders, and were disproportionately applied to minorities. USSC, *Report to the Congress: Cocaine and Federal Sentencing Policy* 93–103, 2002. In 2000, eighty-five percent of defendants sentenced under the minimum mandatory sentences were

Black. The USSC recommended specific amendments, namely an increase in the triggering weight for a five-year mandatory minimum sentence to at least twenty-five grams of crack, rather than five grams, and for a ten-year mandatory minimum for at least 250 grams of crack, rather than fifty grams. It further recommended more severe penalties for higher level drug offenders and recommended that Congress maintain the current quantities for powder cocaine offenses. *Id.* at 104. Once again, Congress did not move on the USSC's recommendations.

### d. *2007.*

The USSC's 2007 report again urged Congress to amend the mandatory minimum sentences of the Anti–Drug Abuse Act. Despite multiple public hearings and expert studies, USSC member U.S. District Court Judge Ruben Castillo observed, "No one has come before us to justify the 100–to–1 ratio."[11] Again, Congress declined to act. However, on this occasion the USSC also proposed certain amendments to the Sentencing Guidelines. By virtue of Congress's failure to oppose them, the amendments went into effect on November 1, 2007. The amendments altered the drug quantity tables for crack cocaine, adjusting them downward by two levels. This modest decrease reduced the average sentence for crack possession from just over ten years to slightly under nine years. Notably, the USSC made the amendments retroactive to all defendants sentenced before November 1, 2007, which eventually enabled approximately 19,500 inmates to petition the courts for sentence reductions.[12]

Significantly, these amendments to the Sentencing Guidelines did not affect the *statutory* minimum mandatory sentences

---

11. David Stout, "Retroactively Panel Reduces Drug Sentences," *N.Y. Times,* Dec. 12, 2007.

12. *Id.*

enacted by Congress. Thus, regardless of the Guidelines amendments, possession of five or more grams of crack cocaine continued to carry a five-year minimum mandatory sentence. The USSC concluded its enactment of the 2007 Sentence Guidelines amendments with the observation that "[a]ny comprehensive solution to the 100–to–one drug quantity ratio requires appropriate legislative action by Congress." United States Sentencing Commission, *Report to the Congress: Cocaine and Federal Sentencing Policy* 104, 2007.

One month later, this chronology reached another important milestone when the United States Supreme Court issued its decision in *Kimbrough v. United States,* holding that the Sentencing Guidelines could not, consistent with the Constitution, be deemed mandatory, but merely advisory. 552 U.S. 85, 108, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007). Although judges were still required to consider the Guidelines carefully in crafting a sentence, they were now empowered to consider the circumstances of the particular defendant and the criminal conduct before them, and to vary from the strict Guidelines range when they found that the range yielded a sentence "greater than necessary to achieve § 3553(a)'s purposes." *Id.* at 110, 128 S.Ct. 558 (quotation marks omitted).

*Kimbrough* recognized a degree of flexibility in the application of the Guidelines, but it did not in any way affect the application of sentences mandated by *statute.* Courts remained bound to comply with mandatory minimum sentences as set forth by statute, even where those sentences were excessive under 18 U.S.C. § 3553(a), which described the criteria generally to be used when no statute trumped. So, as before, regardless of the *Guidelines,* where the charged offense involved five grams or more of crack, the sentence had to be five years at least, with fifty grams

resulting in ten years, and so forth. The 100:1 ratio between crack and powder sentences under the mandatory statutes was unaffected.

And, still, no one could justify this disparity in sentencing. In her *Kimbrough* opinion, Justice Ginsberg reiterated the fundamental flaw of the statute and Guidelines: "This disparity means that a major supplier of powder cocaine may receive a shorter sentence than a low-level dealer who buys powder from the supplier but then converts it to crack." *Id.* at 95, 128 S.Ct. 558. Two years later, the Supreme Court returned to the crack-to-powder issues and held, within the Guidelines context, "that district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines." *Spears v. United States,* 555 U.S. 261, 129 S.Ct. 840, 843–844, 172 L.Ed.2d 596 (2009). Again, however, *Spears,* like *Kimbrough,* gave judges discretion only in cases controlled by the Guidelines; the statutes, when they applied, offered no room to vary the sentence regardless of circumstances.

The impact of these statutes had by this time revealed itself as so manifest an outrage to justice that in the next year Congress acted.

### E. The Fair Sentencing Act of 2010.

Senator Richard J. Durbin introduced the Fair Sentencing Act on October 15, 2009. The Senate unanimously passed the Act On March 17, 2010, and on July 28, it passed the House of Representatives by voice vote. On August 3, 2010, the Fair Sentencing Act of 2010 ("FSA") became law. The FSA amended the Controlled Substances Act, 21 U.S.C. § 841(b)(1) ("CSA"), by increasing to twenty-eight grams (or one ounce) the amount of crack cocaine that triggers a five-year mandatory minimum sentence, increasing to 280

grams (or ten ounces) the amount of crack cocaine to trigger a ten-year sentence, and eliminating mandatory minimum sentences for simple possession of less than twenty-eight grams. In doing this, the FSA reduced the differential in sentencing severity between crack and powder cocaine from 100:1 to roughly 18:1.

Significantly for purposes of this discussion, the FSA did not include an explicit statement as to whether these amendments should be applied retroactively. Despite the lack of an express provision, however, the congressional intent was plain. The revisions in crack sentencing contemplated by the FSA were to be carried out as quickly as possible. The FSA directed the USSC to exercise "emergency authority" to promulgate the amendment "as soon as practicable, and in any event not later than 90 days after the date of enactment of this Act." Fair Sentencing Act of 2010, Pub. L. No. 111–220, § 8, 124 Stat. 2372. The USSC followed this directive and promulgated new Guidelines consistent with the FSA on November 1, 2010. Like all Guidelines, these new Guidelines became applicable to all defendants sentenced after that date, *regardless of when they committed their crimes.*

Apart from Congress's direction to the USSC to draft new Guidelines implementing the FSA in the bureaucratic equivalent of a "New York minute," the comments by the sponsors of the legislation left no room for doubt about Congress's intent to change sentencing practices for crack defendants in federal court immediately. On the morning of August 3, 2010, surrounded by Senators Patrick Leahy, Jeff Sessions, Lindsey Graham, and Orrin Hatch, as well as the director of the Office of National Drug Control Policy and Attorney General Eric Holder, President Barack Obama signed the FSA into law. As Press Secretary Robert Gibbs noted, "[I]f you look at the people that were there at that signing ... that demonstrates ... the glaring nature of what these penalties had done to people and how unfair they were."[13]

The Act's Title, "An Act To Restore Fairness. to Federal Cocaine Sentencing," signified Congress's clear intent to change sentencing practice with regard to crack forthwith. As Senator Durbin stated in introducing the bill, "We have learned a great deal in the last 20 years. We now know the assumptions that led us to create this disparity were wrong." 155 Cong. Rec. S 10491 (daily ed. Oct. 15, 2009) (statement of Sen. Durbin introducing S.1789). Representative James E. Clyburn expressed a similar sentiment: "Twenty years of experience has taught us that many of our initial beliefs were wrong. We now know that there's little or no pharmacological distinction between crack cocaine and powder cocaine." 156 Cong. Rec. H6196 (daily ed. July 29, 2010) (statement of Rep. Clyburn debating S. 1789).

The debates around the FSA revealed an urgency in Congress to right a wrong. Senator Durbin stated:

> African Americans are incarcerated at nearly six times the rate of White Americans. These are issues of fundamental human rights and justice our country must face.... There is widespread and growing agreement that the Federal cocaine and sentencing policy in the United States today is unjustified and unjust. In the final analysis, this legislation is about fixing an unjust law that has taken a great human toll.

---

13. The White House Blog (Aug. 3, 2010), http://www.whitehouse.gov/blog/2010/08/03/ president-obama-signs-fair-sentencing-act.

155 Cong. Rec. S 10488 (daily ed. Oct. 15, 2009) (statement of Sen. Durbin introducing S.1789). Senator Jeff Sessions followed and made similarly compelling remarks:

> I have offered legislation for almost a decade that would substantially improve the sentencing process in a way that I think is fair and constructive.... I do think it is past time to act. We don't need to give up the progress that has been made, but at the same time we need to fix the sentencing.

155 Cong. Rec. S 10488 (daily ed. Oct. 15, 2009) (statement of Sen. Sessions introducing S.1789). Senator Arlen Specter concluded his remarks in support of the bill with a reminder to his colleagues that "[t]he White House and the Department of Justice have asked Congress to eliminate this unfair sentencing disparity. It is time to correct this injustice." 155 Cong. Rec. S 10488 (daily ed. Oct. 15, 2009) (statement of Sen. Specter introducing S.1789).

## III. *DISCUSSION*

■ The question before the court is very simple: does the *law* require this court to sentence Antoine Watts according to a statute found by Congress to be both unjust and racist? An analysis of the Guidelines, of the emerging interpretations of the FSA, of the jurisprudence construing the Saving Statute, and of the authorities governing retroactivity all support a negative answer to this question. In other words, it is perfectly (indeed, almost concededly) obvious what justice requires here, and the law offers no credible barrier to achieving it.

### A. *The Sentencing Guidelines.*

In assessing congressional intent, it is important to underline that, if this case were strictly controlled by the Sentencing Guidelines, there would be no question that Mr. Watts would be sentenced under the new Guidelines as dictated by the FSA, even though he committed his crime prior to the effective date of the new law. *United States v. Carrasco–Mateo*, 389 F.3d 239, 242 (1st Cir.2004) ("A sentencing court must use the guidelines in effect at the time of sentencing unless doing so would present ex post facto problems.").

Congress, of course, knew this and expressed not a mote of discomfort with this reality. Given the five-year statute of limitations, see 18 U.S.C. § 3282, Congress clearly intended that defendants who committed crack offenses involving less than five grams as far back as 2005, but being sentenced after the enactment of the FSA, would receive the benefit of the amended Guidelines eliminating the 100:1 ratio. No convincing reason, based on law or logic, justifies applying the statutory amendments any differently than the Guidelines amendments where a defendant is appearing before the court for the first time for sentencing.

### B. *Recent Authority: Sentenced Versus Non–Sentenced Defendants.*

As of this writing, nine circuit courts of appeals have held that the FSA does not apply to defendants whose sentences had *already been imposed* under the former statute and Guidelines as of the effective date of the FSA.[14] Each of these courts

---

**14.** *United States v. Doggins*, 633 F.3d 379, 384 (5th Cir.2011); *United States v. Reevey*, 631 F.3d 110 (3d Cir.2010); *United States v. Wilson*, 401 Fed.Appx. 760, 761–63 (4th Cir. 2010); *United States v. Hall*, 403 Fed.Appx. 214, 217 (9th Cir.2010); *United States v. Diaz*,

627 F.3d 930, 931 (2d Cir.2010); *United States v. Carradine*, 621 F.3d 575, 580 (6th Cir.2010); *United States v. Bell*, 624 F.3d 803, 814 (7th Cir.2010); *United States v. Brewer*, 624 F.3d 900, 909 n. 7 (8th Cir.2010); *United States v. Lewis*, 625 F.3d 1224, 1228 (10th

held that, as to this class of defendants, the General Saving Statute, 1 U.S.C. § 109, barred retroactive application of the FSA.

These decisions, however broadly worded, do not constitute authority for the notion that defendants *not yet sentenced* (including defendants who have not yet even been charged) should, for the next four-plus years, be sentenced pursuant to the old regime Congress has discarded. At least two powerful reasons support different analyses of these two classes of defendants.

First, the aim of the FSA was to correct *sentencing*, not to remedy long-ago injustice. It is not insignificant that the law was called the Fair *Sentencing* Act. Its goal was plainly to bring an end to the imposition of unfair sentences upon defendants. It was not designed to remedy, nor did its sponsors ever suggest that it was aimed at remedying, arguably unjust prison terms imposed decades ago, a gargantuan task. Again, an examination of Congress's directive regarding the Sentencing Guidelines is telling. The directive to the USSC was to move immediately to amend Sentencing Guidelines that were *currently* being imposed. The fair implication, indeed the obvious implication, of Congress's intent in enacting the FSA was to change the application of the mandatory statutes immediately as well, not to provide a basis for habeas relief for defendants sentenced decades ago.

Second, it is entirely understandable that courts of appeals, for practical reasons, have been reluctant to find that Con-

gress intended the FSA's statutory reform to be applicable to tens of thousands of persons already sentenced and imprisoned. This interpretation would not only "impose[ ] a huge burden on the criminal justice system" but would undercut prosecutorial decisions sometimes made far in the past "including decisions to drop other, valid charges in return for a plea to a crack offense in the belief that severe narcotics sentences would adequately protect society." *United States v. Acoff,* No. 10–285, 634 F.3d 200, 205 (2d Cir., 2011) (Lynch, C.J., concurring).[15]

No equivalent concern about either an undue burden on the system or potentially blind-siding the government exists with regard to defendants awaiting sentencing. In contrast to the tens of thousands of defendants already sentenced, the numbers awaiting sentencing are relatively small. Moreover, if the charging decision with regard to the defendant pending sentencing was based on the old mandatory statutes, the government can supersede and add new charges it might have forgone in reliance on them.

No guidance has yet issued from the First Circuit on the FSA's applicability either to sentenced defendants, or to those awaiting sentencing. Decisions coming from the district courts in the First Circuit are so far in agreement with the decisions of other courts of appeals that the FSA is inapplicable to defendants who were *sentenced* prior to August 3, 2010, the effective date of the statute. *See United States v. Rosario,* 752 F.Supp.2d 82, 2010 WL 4783034 (D.Me.2010); *United States v. Butterworth,* No. 06–62, 2010 WL 4362859,

Cir.2010). As of this writing, the First Circuit, the Eleventh Circuit, and the District of Columbia Circuit have not yet ruled on this issue.

**15.** Significantly, Judge Lynch's concurrence noted that "there are few persuasive reasons

why [a person] should be *sentenced* pursuant to an unjust law when Congress has already replaced it with a more just one." *Acoff,* 634 F.3d at 205 (Lynch, C.J., concurring) (emphasis supplied).

2010 U.S. Dist. LEXIS 114589 (D.Me., Oct. 27, 2010).

With regard to defendants appearing for sentencing, however, U.S. District Judge Brock Hornby of the District of Maine has held that the statutory amendments contained in the FSA are applicable to defendants who committed their crimes prior to its passage but are appearing for sentencing after its effective date. *United States v. Douglas,* No. 09–202, 746 F.Supp.2d 220, 231 (D.Me.2010) ("[A] defendant not yet sentenced on November 1, 2010, is to be sentenced under the amended Guidelines, and the Fair Sentencing Act's altered mandatory minimums apply to such a defendant as well.").

Subsequent decisions issued by a number of district judges around the country have agreed with Judge Hornby's reasoning. *See, e.g., United States v. White,* No. 10–00247, 2011 WL 587100, *1, 2011 U.S. Dist. LEXIS 13352, *2 (D.S.C., Feb. 9, 2011) ("[T]his court concludes that applying the Act to all offenders sentenced after August 3, 2010, comports not only with the text and purpose of the Act, but also with common sense and fair dealing."); *United States v. Cox,* No. 10–85, 2011 WL 92071, *2, 2011 U.S. Dist. LEXIS 2730, *4 (W.D.Wis., Jan. 11, 2011) (citing *Douglas* and holding that "it is no great stretch to find Congress's statements about the urgent need to remedy an unfair sentencing scheme between powder and crack cocaine offenses as a sufficient expression of intent to apply the FSA to those offenders who both enter a plea and are sentenced after its enactment"); *United States v. Whitfield,* No. 10–13, 2010 WL 5387701, *2, 2010 U.S. Dist. LEXIS 135860, *6 (N.D.Miss., Dec. 21, 2010) (citing *Douglas* and holding that "[t]he overarching theme of this country's justice system is fairness.... This court is hesitant to impose a sentence that Congress has deemed un-

fair."). In addition, a number of judges from this district have followed *Douglas* in unreported decisions. *See United States v. Zapata,* No. 10–cr–40045–FDS (Feb. 3, 2011) (citing *Douglas* as authority for sentencing under new Guidelines); *United States v. Angelo,* No. 10–10004–RWZ–1 (Oct. 29, 2010) (same).

Admittedly, some district judges have taken a different view. *See, e.g., United States v. Santana,* 761 F.Supp.2d 131, 148–50, 2011 WL 260744, *13–14 (S.D.N.Y. 2011) (finding *Douglas* "understandable" but incorrect); *United States v. Dickey,* 759 F.Supp.2d 654, 657, 2011 WL 49585, *3 (W.D.Pa.2011) ("This Court respectfully disagrees with Judge Hornby's opinion."); *United States v. Burgess,* No. 09–150, 2010 WL 5437265, *2, 2010 U.S. Dist. LEXIS 136433, *5 (W.D.Pa. Dec. 27, 2010) (same); *United States v. Holmes,* No. 10–110, 2010 WL 4961657, *3–4, 2010 U.S. Dist. LEXIS 126927, *9 (E.D.Va., Dec. 1, 2010) (same).

A careful examination of the law makes clear that Judge Hornby's reasoning in *Douglas* not only avoids perpetuating the injustice that the FSA was intended to remedy but satisfies the demands of the law as well.

## C. *General Saving Statute.*

The main, indeed the only colorable, argument for disregarding congressional intent and continuing to sentence defendants under the old statutory regime rests on the General Saving Statute, 1 U.S.C. § 109. A review of the background of this statute, and the authorities construing it, reveals that it is simply not the straitjacket some courts have supposed it to be.

In 1871, the Supreme Court heard a case involving a defendant charged with forging citizenship papers for travelers on board his ship, in violation of a statute referred to as "the act of 1813." *United States v. Tynen,* 78 U.S. 88, 11 Wall. 88, 20

L.Ed. 153 (1871). At the time that the defendant committed the felony, the statutory punishment was either a fine of $500 to $1000 or a term of imprisonment between three and five years. On July 14, 1870, after the defendant was indicted but before his trial, Congress amended the penalty provision of the Act, setting the fine at $300 to $1000 and the prison term between one and five years. Although the Act of 1870 did not expressly repeal the Act of 1813, the Supreme Court held that "[b]y the repeal of the [penalty provision] of the act of 1813 all criminal proceedings taken under it fell." *Id.* at 95. The Court remanded the case to the lower court to dismiss the indictment.

In response, in 1871, Congress enacted the General Saving Statute. *See Hamm v. Rock Hill,* 379 U.S. 306, 314, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964) (noting that the Saving Statute was enacted after "a substitution of a new statute with a greater schedule of penalties was held to abate the previous prosecution"). *See also Warden, Lewisburg Penitentiary v. Marrero,* 417 U.S. 653, 660, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974) (noting that Saving Statute was enacted "to abolish the common-law presumption that the repeal of a criminal statute resulted in the abatement of 'all prosecutions which had not reached final disposition in the highest court authorized to review them' ")(quoting *Bradley v. United States,* 410 U.S. 605, 607, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973)). The General Saving Statute provides that "[t]he repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide." 1 U.S.C. § 109.

While the wording of the statute may appear to be broad, when seen in its context, its intent is limited and reasonable: to insure that an adjustment of a penalty provision of a criminal statute does not erase the statute entirely, unless Congress explicitly so provides. As Justice Blackmun articulated, the Saving Statute is to be applied in order to "prevent technical abatement of a prosecution." *Marrero,* 417 U.S. at 665, 94 S.Ct. 2532 (Blackmun, J., dissenting).

### D. *Application of the Saving Statute to the FSA.*

The government argues that, because the FSA includes no *express* provision to the contrary, this new law cannot supplant statutory penalty provisions in effect at the time that the defendant here committed his crime. In support of this misconstruction of the General Saving Statute, the government relies almost entirely upon *Warden, Lewisburg Penitentiary v. Marrero,* 417 U.S. 653, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974).

It is true that at one point Justice Brennan's majority opinion states that 1 U.S.C. § 109 "has been held to bar application of ameliorative criminal sentencing laws repealing harsher ones in force at the time of the commission of an offense." *Id.* at 661, 94 S.Ct. 2532; *see also United States v. Havener,* 905 F.2d 3, 7 (1st Cir.1990) (observing that Saving statute is "a special Congressional statute [that] provides that new statutes that *decrease* punishment *normally* do not affect pending prosecutions") (first emphasis in original; second emphasis supplied). Following on this, the government argues, because the court must "assume that Congress is aware of existing law when it passes legislation," *Miles v. Apex Marine Corp.,* 498 U.S. 19, 38, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), the court must also assume that Congress intended the Saving Statute to bar retroactive application of the FSA. The culmination of this process of logic is that the court has no alternative but to sentence

Mr. Watts to five years in prison, despite Congress's determination that the statute was mistaken, unjust, and racially tainted.[16] An examination of the muddied jurisprudential history of the General Saving Statute reveals the impertinence of the government's position.

1. *General Saving Statute Jurisprudence.*

In *Warden, Lewisburg Penitentiary v. Marrero*, as noted above, the Supreme Court observed that "the saving clause has been held to bar application of ameliorative criminal sentencing laws repealing harsher ones in force at the time of the commission of the offense." 417 U.S. at 661, 94 S.Ct. 2532 (citing cases from the D.C., Second, and Fourth Circuits). *Marrero* concerned a provision of a general parole statute that, prior to repeal, prohibited parole for certain narcotics offenders. *Id.* at 655, 94 S.Ct. 2532. The defendant, who had been sentenced under the repealed statute, sought parole consideration pursuant to a new law that contained its own saving clause providing that " '[p]rosecutions for any violation of law occurring prior to the effective date of [the new law] shall not be affected by the repeals or amendments made by [it] . . . or abated by reason thereof.' " *Id.* at 656 n. 4, 94 S.Ct. 2532 (quoting 18 U.S.C. § 4202 (1103)(a)). The Court's holding was that § 1103(a) of the repealing statute barred application of the new statute to the defendant. *Id.* at 657–58, 94 S.Ct. 2532.

In Part II of its decision, the Court went on to note, as an alternative basis for its decision, that in those circumstances the General Saving Statute also barred the Board of Parole from considering the defendant for parole. *Id.* at 659, 94 S.Ct. 2532. The Court focused primarily on whether parole ineligibility constituted a "penalty, forfeiture, or liability" such that it would be protected by the General Saving Statute. *See* 1 U.S.C. § 109 ("The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute . . . ."). The Court determined that parole ineligibility was a form of "penalty," and thus that it fell within the General Saving Statute. In his conclusion, Justice Brennan responded to the defendant's argument that "denying respondent eligibility for parole . . . frustrates the current congressional goal of rehabilitating narcotics offenders" by observing that, while forceful, "it is addressed to the wrong governmental branch. Punishment for federal crimes is a matter for Congress. . . . [H]owever severe the consequences for respondent, Congress trespassed no constitutional limits." *Marrero*, 417 U.S. at 664, 94 S.Ct. 2532.

Yet, to end the analysis of *Marrero* here is to disregard crucial differences between the parole statute in question there and the FSA. Justice Brennan observed that the lower court, in holding that the General Saving Statute did not apply to the new law, had relied on prior statements by the Supreme Court that 1 U.S.C. § 109 "is intended to obviate 'mere technical abatement[s].' " *Id.* at 660 n. 11, 94 S.Ct. 2532 (quoting *Hamm v. Rock*

---

**16.** If Congress had explicitly stated that the FSA would not be retroactive, the situation would of course be entirely different. Significantly, on the same day that it passed the Fair Sentencing Act, the House considered but did not pass the Drug Sentencing Reform and Cocaine Kingpin Trafficking Act of 2009. Notably, this Act contained a specific provision that "There shall be no retroactive application of any portion of this Act." 156 Cong. Rec. H6196 (July 28, 2010). Congress apparently felt the need to include this provision, which under the government's view here would have been superfluous given the General Saving Statute.

*Hill,* 379 U.S. 306, 314, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964)). He determined that the no-parole provision "was directly incorporated into the sentencing provisions" of the repealed statute such that the defendant's conviction and sentence would not remain "intact" if the no-parole provision were repealed, with the result that "his prosecution would 'technically' abate under the common-law rule." *Id.* Justice Blackmun observed in dissent that such broad application of the Saving Statute "is not in line with the traditional common-law rule favoring application of existing law. The statute has never been applied by this Court other than to prevent technical abatement of a prosecution." *Marrero,* 417 U.S. at 665, 94 S.Ct. 2532 (Blackmun, J., dissenting, with whom Douglas, J. and Marshall, J. joined). However, even under Justice Brennan's broad interpretation of the Saving Statute, retroactive application of the FSA cannot be described as endangering the "intactness" of any conviction or sentencing of Mr. Watt, since a conviction has not yet occurred (and may never) and no sentence has been imposed. In short, none of the risks identified by Justice Brennan in *Marrero* associated with changing the penalty of a defendant already sentenced exists in the case before this court.

But there is a much more important reason why *Marrero* does not control the application of the FSA. The entire discussion of the General Saving Statute in *Marrero* focuses on the narrow question of whether a "penalty, forfeiture, or liability" includes parole ineligibility. The majority's only discussion about the *general* applicability of the Saving Statute appears in a footnote in which Justice Brennan explicitly indicates that where a statute contains a "specific directive" that "can be said by fair implication or expressly to conflict with § 109 . . . there [would] be reason to hold that [the new statute] superseded

§ 109." *Id.* at 659 n. 10, 94 S.Ct. 2532 (citing *Great No. R. Co. v. United States,* 208 U.S. 452, 465–66, 28 S.Ct. 313, 52 L.Ed. 567 (1908)).

Thus, contrary to the government's argument, *Marrero* did not require Congress to include an *express* saving provision describing the statute's retroactive application in so many words, but simply a "specific directive," discernible "by fair implication." This is exactly what the FSA includes, in the form of the "specific directive" by Congress to the USSC to take emergency measures to amend the Guidelines immediately to ensure that judges would be using the new rules in sentencing defendants coming before them, necessarily including defendants who had committed their crimes prior to the effective date of the statute. It is only by covering his eyes and plugging his ears that any fairminded person could avoid the conclusion that Congress intended, by "fair implication," to treat the statutory amendments, whose effect was even more unjust than the effect of the Guidelines, the same way it directed the Guidelines to be treated, that is, to mandate that the amended statutes be applied to all defendants coming before federal courts for sentencing. Apart from its distorted interpretation of the Saving Statute and *Marrero,* the government's argument ignores serious misgivings expressed in decisions following *Marrero* about the validity of any rule that places restrictions on congressional enactments by demanding that the acts of one Congress satisfy technical requirements imposed by a previous Congress.

Thirty-one years after *Marrero* was decided, Justice Scalia decried the "burden [on] the future exercise of legislative power" that Congress regularly attempted to achieve by requiring express statements such as the one the government demands here. *Lockhart v. United States,* 546 U.S.

142, 149, 126 S.Ct. 699, 163 L.Ed.2d 557 (20045) (Scalia.J., concurring). Such " 'provisions cannot justify a disregard of the will of Congress as manifested either expressly or *by necessary implication* in a subsequent enactment.' " *Id.* at 148, 126 S.Ct. 699 (emphasis in original) (quoting *Great Northern R. Co. v. United States,* 208 U.S. 452, 465, 28 S.Ct. 313, 52 L.Ed. 567 (1908)). Justice Scalia stated that "[w]hen the plain import of a later statute directly conflicts with an earlier statute, the later enactment governs, regardless of its compliance with any earlier-enacted requirement of an express reference or other 'magical password.' " *Id.* at 149, 126 S.Ct. 699.

■ The First Circuit has recognized " 'the bedrock principle that implied repeals of federal statutes are disfavored.' " *Passamaquoddy Tribe v. Maine,* 75 F.3d 784, 790 (1996) (quoting *Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 703 (1st Cir.1994)). A crucial corollary to this principle, however, is that where two statutes are irreconcilable, " 'the latter act, without any repealing clause, operates to the extent of the repugnancy as a repeal of the first.' " *Id.* (quoting *United States v. Tynen,* 78 U.S. (11 Wall.) 88, 92, 20 L.Ed. 153 (1870)).

Nothing could be plainer in the context before this court than (to use Justice Scalia's term) the "direct conflict" between the FSA and the previous mandatory sentencing statutes, or (to use the language of the First Circuit) the "repugnancy" of the new statute in relation to the old. Under these circumstances, no explicit language, no "magical password," is needed to find that the amended statutes should apply to current sentencing.

This conclusion is supported by a review of jurisprudence discussing retroactivity, which discloses numerous occasions on which new statutes have been held to ap-

ply retroactively without an express provision in the statutes themselves. Because these are civil cases dealing with repealing statutes that do not impact the "penalty, forfeiture, or liability" of the repealed statute, the General Saving Statute is inapplicable. However, the court would be remiss if it disregarded entirely these legal principles that undergird our system of justice.

*2. Retroactivity Jurisprudence.*

The Supreme Court has long recognized the tension between two well-developed legal tenets: first, "a court is to apply the law in effect at the time it renders its decision," *Bradley v. School Bd. of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); second, "retroactivity is not favored in the law." *Bowen v. Georgetown Univ. Hospital,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). In *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* the Court reconciled these principles by concluding that "where the congressional intent is clear, it governs," and proceeded to resolve the issue of congressional intent by examining the statute at issue and its legislative history. 494 U.S. 827, 837, 839, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (concluding that Congress did not intend the statute in question to be applied retroactively).

Several years later, the Court found itself once again trying to reconcile the tensions between applying current law and avoiding retroactivity in *Landgraf v. USI Film Prods.,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). In *Landgraf,* the Court observed that "[t]he largest category of cases in which we have applied the presumption against statutory retroactivity has involved new provisions affecting contractual or property rights, matters in which predictability and stability are of prime importance." *Id.* at 272, 114 S.Ct.

1483. In contrast, the Court noted the principle "at work in the common-law presumption about repeals of criminal statutes, that the government should accord grace to private parties disadvantaged by an old rule when it adopts a new and more generous one." *Id.* at 276 n. 30, 114 S.Ct. 1483 (citing *United States v. Chambers,* 291 U.S. 217, 222–23, 54 S.Ct. 434, 78 L.Ed. 763 (1934)).

*Landgraf* makes it crystal clear that the analysis of retroactivity is nowhere near as straightforward as the government suggests. The determination requires much more than simply looking to see if the new statute contains an "express" provision and, if it does not, abjuring retroactive application. As the Court stated, "[w]hile statutory retroactivity has long been disfavored, deciding when a statute operates 'retroactively' is not always a simple or mechanical task." *Id.* at 268, 114 S.Ct. 1483. Significantly, for present purpose, the Court went on to state that "[e]ven absent specific legislative authorization, application of new statutes passed after the events in suit is unquestionably proper in many situations." *Id.* at 273, 114 S.Ct. 1483. *See also Kaiser Aluminum,* 494 U.S. at 837, 110 S.Ct. 1570 ("[E]ven where the intervening law does not explicitly recite that it is to be applied to pending cases, it is to be given recognition and effect.").

Perhaps all that is entirely clear in the foggy landscape of retroactivity jurisprudence, including the cases construing the General Saving Statute, is that congressional intent is the guiding light. With this illumination, the court's direction is obvious.

3. *Congressional Intent.*

Every day that passes without taking action to solve this problem is another day that people are being sentenced under a law that virtually everyone agrees is unjust. . . . If this bill is enacted into law, it will immediately ensure that every year, thousands of people are treated more fairly in our criminal justice system.

156 Cong. Rec. S 1680 (Mar. 17, 2010) (statement of Sen. Durbin).

[The current] policy is wrong and unfair, and it has needlessly swelled our prison, wasting precious Federal resources. These disproportionate punishments have had a disparate impact on minority communities. This is unjust and runs contrary to our fundamental principles of equal justice under law.

*Id.* (statement of Sen. Leahy).

Since 1995, Congress has been urged to take action to remedy the disparity in cocaine sentencing. Although fifteen years passed before it acted, once it took up the cause, Congress's intent to effect an immediate impact upon sentencing practices was manifest.

"It is apodictic that the language of a statute constitutes the preeminent indicator of legislative intent." *Frazier v. Fairhaven Sch. Comm.,* 276 F.3d 52, 68 (1st Cir.2002). Looking to the language of the FSA, the only instruction concerning its application is its unambiguous directive to the USSC to promulgate the amendment "as soon as practicable, and in any event not later than 90 days after the date of enactment of this Act." Fair Sentencing Act of 2010, Pub. L. No. 220, § 8, 124 Stat. 2372 (2010). Given that the Guidelines are solely advisory and are trumped by any statutory mandates, and the fact that the injustice of the statutory minimums was *more* pernicious than the impact of the old Guidelines, Congress's directive would be nonsensical if it did not apply to the statutory amendments as well.

As noted, Congress had to have been aware that its directive would result in an immediate amendment to the Guidelines upon which federal district court judges rely when making their sentencing decisions. *See Gall v. United States*, 552 U.S. 38, 50, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007) ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). Because a "sentencing court customarily applies the guidelines in effect on the date of sentencing," *United States v. Tejada–Beltran*, 50 F.3d 105, 108 n. 3 (1st Cir. 1995), an amendment consistent with the FSA would result in immediate application of the new, far fairer sentencing regime, even in the case of defendants who committed their crimes before the effective date of the statute.

Congress's obvious intent to immediately substitute the new mandatory statutes for the old in ongoing sentencing is underlined by a consideration already noted in this memorandum. The statute of limitations for the prosecution of drug crimes is five years. *See* 18 U.S.C. § 3282. Can it possibly be that Congress intended district court judges to continue to apply a sentencing regime that it had declared unfair and contrary to our fundamental principles of justice to defendants for five more years? The only conceivable answer to this question is "no."

## IV. CONCLUSION.

For the foregoing reasons, this court will apply the FSA, including both the amended statutory provisions and the amended Guidelines, to all defendants being sentenced from this day forward.[17]

17. Whether the FSA and the amended Guidelines are applicable to defendants already sentenced is not a question before the court, and,

For the reasons set forth herein, Defendant's Motion Regarding Application of the FSA (Dkt. No. 69) has been allowed.

It is So Ordered.

as noted, would require an entirely different analysis. The court offers no opinion on that matter.