UNITED STATES of America,
Plaintiff,

v.

**Robert H. SHULL, Defendant.**

Case No. 2:07–CR–223.

United States District Court,
S.D. Ohio,
Eastern Division.

June 29, 2011.

Timothy D. Prichard, United States Attorneys Office, Columbus, OH, for Plaintiff.

Gordon Griswold Hobson, Jr., Federal Public Defender, Columbus, OH, for Defendant.

### OPINION & ORDER

ALGENON L. MARBLEY, District Judge.

## I.  INTRODUCTION

This matter is before the Court on Defendant Robert Shull's resentencing. A jury found Shull guilty on a two-count indictment. Count One was conspiracy to possess with intent to distribute over 50 grams of cocaine base in violation of 21 U.S.C. § 846, and Count Two was possession with intent to distribute more than 50 grams of cocaine base in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(iii). Shull appealed. The Court of Appeals reversed

his conviction on Count One, and affirmed his conviction on Count Two.

## II. BACKGROUND

### A. THE OFFENSE

The evidence at trial showed that on January 20, 2007, Columbus police officers were conducting patrol while parked in a carwash parking lot. Late in the afternoon, a car with two African American men drove into the lot, and one of the officers recognized the man in the passenger seat as Robert Shull. The officer knew that he had an outstanding warrant for driving without a license. When Shull exited the vehicle along with the car's driver, the officers arrested him for the outstanding warrant. The officers then noticed a baggie that they suspected contained marijuana on top of the center console in the car, and they arrested the driver. The vehicle was later searched, and one small baggie and two large baggies containing crack cocaine were recovered. The crack was determined to weigh 52.9 grams.

After the jury found Shull guilty, this Court sentenced him to a term of 121 months on Counts One and Two with the sentences to run concurrently. Shull appealed, and the Sixth Circuit reversed his conviction on Count One, the conspiracy count. It affirmed his conviction on Count Two. The court held that because the two counts were grouped together for sentencing, Shull had to be resentenced. It vacated the sentence and remanded the case to this Court for resentencing. *United States v. Shull*, 349 Fed.Appx. 18, 22 (6th Cir.2009).

### B. A BRIEF HISTORY OF CRACK COCAINE SENTENCING

The history of unfairness in crack cocaine sentencing is well known, but the inaccuracies it was based on and the injustices it caused make its retelling all the more necessary. During the 1980s, public concern surrounding drug abuse rose dramatically. *See* David A. Sklansky, *Cocaine, Race, and Equal Protection*, 47 STAN. L.REV. 1283, 1286 (1995). As drug use was transformed from the typical social problem into a full-blown national crisis, crack was identified as society's most dangerous scourge. Increased inner-city and gang violence were blamed on the recently discovered drug, and allegations swirled that "crack babies" and child neglect were due to crack's potent addictive qualities. *See* Nekima Levy—Pounds, *Can These Bones Live? A Look at the Impacts of the War on Drugs on Poor African—American Children and Families*, 7 HASTINGS RACE & POVERTY L.J. 353, 356 (2010). When basketball player Len Bias overdosed on powder cocaine two days after being selected by the Boston Celtics as the second overall pick in the 1986 NBA Draft, many mistakenly believed his death to be the result of crack cocaine. His death sparked a media frenzy, and demands arose for harsh penalties and tough sentences. *Id.* at 356–57.

### 1. The Anti–Drug Abuse Acts of 1986 and 1988

Congress responded immediately with the Anti–Drug Abuse Act of 1986, Pub.L. 99–570, 100 Stat. 3207 (1986). Believing that crack was more addictive and potent than powder cocaine, spread rapidly due to its cheap costs, was closely connected to crime and violence, triggered perilous physiological effects, and was attractive for use and sale by youth, Congress enacted mandatory minimum sentences for drug trafficking offenses that were based on an 100:1 ratio between the weights of crack and powder cocaine.[1] *See* United States

---

1. The statements of Senators and Representa- tives are illuminating and provide context for

Sentencing Commission, *Report to the Congress: Cocaine and Federal Sentencing Policy* 9–10 (May 2002). The Sentencing Commission adopted this ratio in calculating its Sentencing Guidelines.[2] *See* U.S.S.G. § 2D1.1.

Under the federal statute, while five-hundred grams of powder triggered a five-year mandatory minimum, merely five grams of crack carried the same sentence. Five-thousand grams of powder, but only fifty grams of crack, led to at least ten years of incarceration. To put this into perspective, five grams is about the weight of a typical sugar packet (or 10 to 50 doses); five-hundred grams is more than two cups (or 2500 to 5000 doses). *See* 1995 *Report* at ix.

Prior convictions for drug offenses (including marijuana) would increase the mandatory minimums. Possession of five grams of crack with one prior drug conviction doubled the mandatory minimum to ten years. Possession of fifty grams of crack with one prior drug conviction doubled it to twenty years. And possession of fifty grams of crack with two prior drug convictions carried a mandatory sentence of life in prison without the possibility of parole. In practice, the sentences that resulted from the 1986 Act were no less absurd: a street-level dealer of crack cocaine received the same average sentence as an importer or high-level supplier of powder cocaine. *See* 2002 *Report* at 43.

Two years later, Congress passed the Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, 102 Stat. 4181 (1998), which further emphasized the alleged harmfulness of crack cocaine in comparison to both powder cocaine and other drugs. This Act created a mandatory minimum penalty for the simple possession of crack cocaine: possession of more than five grams of cocaine triggered a minimum five-year sentence. This law made crack cocaine the

---

the passage of the 1986 Act. *See* 132 Cong. Rec. 22,993 (daily ed. Sept. 11, 1986) (statement of Rep. LaFalce) ("Crack is thought to be even more highly addictive than other forms of cocaine or heroin."); *id.* at 26,447 (daily ed. Sept. 26, 1986) (statement of Sen. Chiles) ("We are all familiar with cocaine; it has been with us for a long time. Crack, however, is something altogether different. It is far more powerful, far cheaper, far more addictive, and increasingly available."); *id.* at 22,991 (daily ed. Sept. 11, 1986) (remarks of Rep. Dorgan) ("Police report that increased crack use has also engendered increased crime in several cities. Users become so deranged from its psychotic effects that they may perpetrate brutal crimes."); *id.* at 27,176 (daily ed. Sept. 30, 1986) (statement of Sen. Gary Hart) ("Then along came crack-cocaine—and the high was available to all. So too, however, were the lows: The raging paranoia, the addiction rooted deep in the brain's chemical structure, and worst, the senseless deaths."); *id.* at 27,187 (daily ed. Sept. 30, 1986) (statement of Sen. Leahy) ("Crack is available to the young, and it will be in the schools this fall. I have heard stories of children as young as nine who are already crack users. The sellers also use these children as lookouts and as workers in houses that manufacture crack."); *"Crack" Cocaine: Hearing Before the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs of the United States Senate,* 99th Cong. 6 (July 15, 1986) (statement of Sen. Nunn) ("Dealers in the more conventional form of cocaine—the so-called 'white powder' variety—generally do not barter their cocaine for stolen goods. But reportedly, because of the relatively low price of this form of cocaine, crack dealers do accept stolen property as payment.... Police are anticipating an increase in burglaries and similar violations as crack use spreads.").

2. In the Sentencing Reform Act of 1984, 98 Stat.1987, 18 U.S.C. § 3551 *et seq.* (2000 ed. and Supp. V), Congress created the Sentencing Commission and instructed it to promulgate the Sentencing Guidelines. The first edition of the Guidelines became effective in November 1987. *See* United States Sentencing Commission, *Special Report to Congress: Cocaine and Federal Sentencing Policy* ii-iv (Feb.1995).

only drug with a mandatory minimum penalty for a first time offense of simple possession. By contrast, simple possession of any quantity of any other drug for a first-time offender, including powder cocaine, was a misdemeanor offense that carried a maximum penalty of one year of incarceration. In practice, an offender who simply possessed five grams of crack cocaine received the same five-year mandatory minimum sentence as a major trafficker of any other drug. *See* 1995 *Report* at v.

### 2. The War on Drugs

The 1986 and 1988 Acts were part of a more comprehensive "War on Drugs," which began in 1971 and accelerated in the mid–1980s. As part of this campaign, federal and state officials amended sentencing policies, adopted "tough on crime" legislation, and introduced harsh mandatory minimums. *See* Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* 11, 47–57 (2010); Marc Mauer, *Why Are Tough on Crime Policies So Popular?*, 11 Stan. L. & Pol'y Rev. 9, 10 (1999). Concomitant with the ratcheting up of penalties for drug offenders, Congress limited judicial discretion in sentencing. The confluence of these two trends has resulted in massive growth in incarceration that bears little correlation to crime rates. *See* Slansky at 1285; *United States v. Bannister*, 786 F.Supp.2d 617, 651, 2011 WL 1361539, at *30 (E.D.N.Y.2011) ("noting that [t]oday's high incarceration rate bears little relationship to the prevalence of crime") (citing Philip J. Cook & Jens

Ludwig, *The Economist's Guide to Crime Busting* 64, Wilson Q., Winter 2011).

Over the past thirty years, the adult prison population in the United States has skyrocketed from around 300,000 to 2.3 million—it is now the largest prison population in the world. The Pew Center on the States, *One in 100: Behind Bars in America* 5 (2008), *available at* http://www.pewcenteronthestates.org/uploadedFiles/8015PCTS—Prison08—FINAL—2—1—1—FORWEB.pdf. This increase—in both State and Federal prisons—is mostly due to the rise of imprisoned drug offenders. *See* Alexander at 6. In Federal prisons, the population of drug offenders has risen from 4,749 to over 100,000—from a quarter to more than half of all federal inmates.[3] Heather C. West, et al., Bureau of Justice Stat., U.S. Dep't of Justice, *Prisoners in 2009* 33 (2010), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/p09.pdf; Bureau of Justice Stat., U.S. Dep't of Justice, *Sourcebook of Criminal Justice Statistics* 519 (2003), *available at* http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=1219. Not only are there more drug offenders in our prisons, but they are spending more time there: on average, drug trafficking offenders serve longer federal sentences (seventy-eight months) than federal offenders convicted of manslaughter (sixty-seven months), arson (fifty-eight months), and assault (thirty-seven months). Bureau of Justice Stat., U.S. Dep't of Justice, *Sourcebook of Criminal Justice Statistics*, Table 5.31.2009 (2009), *available at* http://www.albany.edu/sourcebook/pdf/t5312010.pdf.

---

**3.** In 2010, fifty-five percent of federal inmates were serving time for drug offenses. Fifteen percent were convicted of weapons offenses, eleven percent of immigration violations, eight percent of violent crimes, five percent of fraud, four percent of property crimes, and three percent of sex offenses. *See Hearings Before the Subcommittee on Commerce, Justice, Science, and Related Agencies of the*

*House Committee on Appropriations*, 111th Cong. 6 (March 10, 2009) (Statement of Harley G. Lappin, Director, Federal Bureau of Prisons, on the Federal Prisoner Reentry and the Second Chance Act). By comparison, only eighteen percent of state prisoners are serving time for drug offenses. *See Prisoners in 2009* 7.

Taxpayers must bear the enormous costs of this over-incarceration, which now amounts to at least $70 billion a year. *See* Tracey Kyckelhahn, Bureau of Justice Stat., U.S. Dep't of Justice, *Justice Expenditure and Employment Extracts, 2007* (2010), *available at* http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=2315; *see also* 74 Fed.Reg. 33,279 (July 10, 2009) (reporting that in 2008, the average annual cost of incarceration for federal inmates was $25,895).

If the current pace continues, one in three black men will go to prison at some point in their lives. *See* Thomas P. Bonczar, Bureau of Justice Stat., U.S. Dep't of Justice, *Prevalence of Imprisonment in the U.S. Population, 1974–2001* 8 (2003). This percentage can be traced to the War on Drugs' subjection of African Americans to high sentences and incarceration rates, neither of which can be explained by the realities of drug abuse. Since the 100:1 ratio was enacted, the vast majority of those convicted of crack offenses—approximately 85%—have been black. *Kimbrough v. United States,* 552 U.S. 85, 98, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007); United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* 113 (Nov.2004). This vast disparity did not exist before the Guidelines. In the first year and a half of Guidelines sentencing, blacks began to receive sentences that were more than 40% longer than whites. *See* Bureau of Justice Stat., U.S. Dep't of Justice, *Sentencing in Federal Courts: Does Race Matter?* 6–7 (Dec.1993). Today, black offenders convicted of drug trafficking offenses continue to serve significantly longer sentences than white offenders—an average of 92.1 months for blacks and 57.9 months for whites. According to the Sentencing Commission, lowering the 100:1 ratio would do more than any other single policy change to reduce this gap. *See Fifteen Years of Guidelines Sentencing* at 132.

Notably, conviction rates are disproportionate to actual usage rates: government studies repeatedly show that more whites use and sell crack than blacks. *See* U.S. Department of Health and Human Services, *2009 National Survey on Drug Use and Health,* Table 1.34A: Crack Use By Demographic Characteristics (2009); U.S. Department of Health and Human Services, *2003 National Survey on Drug Use and Health,* Tables 1.43A and 1.43B: Crack Use By Demographic Characteristics (2003); *see also* H. Rep. No. 111–670, at 2–4 (stating that government data indicates that two-thirds of crack cocaine users in the U.S. are white or Hispanic); Dorothy Lockwood, Anne E. Pottieger, & James A. Inciardi, *Crack Use, Crime by Crack Users, and Ethnicity, in* ETHNICITY, RACE, AND CRIME 21 (Darnell F. Hawkins ed., 1995) (noting that as individuals generally buy drugs from people who share their racial or ethnic background, there are likely more whites selling crack than blacks). In 1993, for example, 65% of the people who had used crack were white, but whites amounted to only 4% of federal offenders convicted of crack trafficking. *United States v. Armstrong,* 517 U.S. 456, 479–80, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (Stevens, J., dissenting) (citations omitted). The disconnection between usage and conviction rates "foster[s] disrespect for and lack of confidence in the criminal justice system" because it perpetuates an image that the system is unjust and unfair. *Kimbrough,* 552 U.S. at 98, 128 S.Ct. 558 (quoting 2002 *Report* at 103); *see also* William J. Stuntz, *Race, Class, and Drugs,* 98 COLUM. L.REV. 1795, 1835 (1998) ("If there is anything at all to the proposition that biased enforcement and punishment undermine the law's normative force, this sentencing disparity ought to be abolished, or at least dramatically reduced.").

The harsh impact of the Guidelines and mandatory minimums has not gone unno-

ticed by judges. *See United States v. Gonzalez–Ramirez*, 561 F.3d 22, 31 (1st Cir.2009) ("The Judicial Conference of the United States for almost 20 years, and the Sentencing Commission for almost 10 years, have pleaded with the judiciary committees of Congress to do something about the serious injustices that these long, mandatory minimum sentences impose—to no avail.") (Merritt, J., concurring); *United States v. Pruitt*, 502 F.3d 1154, 1171 n. 2 (10th Cir.2007) (stating that the crack Guidelines are "virtually indefensible") (McConnell, J., concurring); *United States v. Ricks*, 494 F.3d 394, 403 (3d Cir.2007) (noting that the 100:1 ratio "leads to unjust sentences"); *United States v. Vasquez*, No. 09–CR–259, 2010 WL 1257359 (E.D.N.Y.2010) ("The mandatory minimum sentence in this case supplanted any effort to do justice, leaving in its place the heavy wooden club that was explicitly meant only for mid-level managers of drug operations."); *United States v. Gaviria*, 804 F.Supp. 476, 480 (E.D.N.Y. 1992) ("Injustice sometimes results from the rigid operation of the high mandatory minimum sentences contained in the federal drug laws."). They have also commented on the racially biased impact of the excessive sentences. *See United States v. Dumas*, 64 F.3d 1427, 1432 (9th Cir.1995) (observing that it was "shocking ... that the punishment for the crack cocaine offense is the same as the punishment that would have been imposed for a comparable offense involving 100 times as much powder cocaine, and [that] the evidence indicates that 92% of federal prosecutions for crack cocaine, which required the enormously higher terms of imprisonment, involve African–Americans"); *United States v. Clary*, 846 F.Supp. 768, 772, 786 (E.D.Mo.1994) (noting that the 100:1 ratio and mandatory minimum sentences have "created a situation that reeks with inhumanity and injustice" and is borne disproportionately by black defendants); *United States v. Patillo*, 817 F.Supp. 839, 843 n. 6 (C.D.Cal.1993) ("I, for one, do not understand how it came to be that the courts of this nation, which stood for centuries as the defenders of the rights of minorities against abuse at the hands of the majority, have so far abdicated their function that this defendant must serve a ten year sentence ... treating crack one hundred times more severely than cocaine, seems arbitrary at best, and disproportionately affects black defendants.").

### 3. The Push for Reform

The 100:1 ratio has sent hundreds of thousands to jail for far too long, provoked outrage over its disparate racial impact, and cost the nation billions. Quite frankly, there is no justification for these results. Twenty-five years after it was established, it is clear that the factual premises underlying this disparity were wrong from the very beginning. Current scientific evidence suggests that there is no inherent difference between the addictiveness of crack and powder cocaine; the variation lies in how the drug is ingested.[4] *See*

---

4. The Sentencing Commission concluded that crack may be more addictive than powder due to its methods of administration. *See* 2002 *Report* at 17–19; United States Sentencing Commission, *Report to Congress: Cocaine and Federal Sentencing Policy* 63–67 (May 2007). The testimony of scientists before the Commission does not support this conclusion. Different methods of ingestion produce different types and lengths of highs, but different forms of cocaine are not more or less addictive. Crack is traditionally smoked, and powder used intravenously, intranasally, or orally. Dr. Glen Hanson, the Acting Director of the National Institute on Drug Abuse, testified that if the Sentencing Commission wanted to distinguish between types or uses of cocaine, the best method would not be to divide crack and powder, but to make separations based on the rapidity of delivery systems, with the most rapid being smoked and intravenous use, followed by intranasal, and

*Restoring Fairness to Federal Sentencing: Addressing the Crack–Powder Disparity: Hearing Before the Subcomm. on Crimes and Drugs of the S. Comm. on the Judiciary,* 111th Cong. 1, 9 (2009) (Statement of Lanny A. Breuer, Assistant Attorney Gen. of the Criminal Division, United States Department of Justice) ("[W]e cannot ignore the mounting evidence that the current cocaine sentencing disparity is difficult to justify based on the facts and science, including evidence that crack is not an inherently more addictive substance than powder cocaine."). Youth epidemics never materialized as feared. *See* 2002 *Report* at 70 (reporting that crack cocaine use and sales among 18– to 25–year–olds was very rare, and youth were more likely to use powder than crack). The association of crack with violent behavior and weapon use was factually inaccurate. *See* Robert Sweet, *Will Money Talk?: The Case For a Comprehensive Cost–Benefit Analysis of the War on Drugs,* 20 Stan. L. & Pol'y Rev. 229, 230–31 (2009) (noting that in 2005, approximately 90% of offenders committed no violence in connection with their drug crimes.); 2007 *Report* at 37 (noting that the distinction was minimal because in 2005, violence occurred in powder offenses in 6.2% of powder cases and 10.4% of crack cases; in 2000, 9.0% of powder cases and 11.6% of crack cases). The Sentencing Commission concluded that when violence occurred in connection with drug offenses, it should not result in an across-the-board increase for all offenders, but as a sentencing enhancement in necessary situations. *See* 2002 *Report* at 100–01. Research has indicated that crack cocaine use by expectant mothers is not as harmful as initially believed, bears the same risks as using powder cocaine or tobacco, and is less damaging than alcohol use. *See* 2007 *Report* at 69 (citing numerous scientific studies); 2002 *Report* at vi.

Not only has the 100:1 ratio proved to be unjustifiable, it has failed to accomplish its major goal: stopping drug traffickers. *See* Marc Mauer & Ryan King, *A 25 Year Quagmire: The War on Drugs and Its Impact on American Society* 14 (2007). Most of those incarcerated for crack offenses are not the high-level traffickers who import and manage the distribution of drugs throughout the country, but street-level dealers, couriers/mules, or lookouts. *See* 2002 *Report* at 38 and fig. 5 (stating that in 2000, 66.5% of crack offenders were street-level dealers, 2.4% were couriers or mules, and 3.8% were lookouts). Even as more men and women are sent to prison, crack prices have fallen, indicating that the supply is growing and the harsh sentences are not targeting the true power players in the game.[5] *See* Mark Osler, *The slow fade of Len Bias' ghost,* Dallas Morning News, July 29, 2010, *available at* http://www.dallasnews.com/opinion/latest-columns/

---

then oral. *U.S. Sentencing Commission Hearing, 2/25/02: Cocaine Pharmacology, "Crack Babies," Violence,* 14 Fed. Sent.R. 191, 192 (2002). According to Dr. Hanson, there are not "significant differences" in addiction rates or pharmacological effects between crack that is smoked and powder that is used intravenously, and thus a distinction between crack and powder on the grounds of harmfulness or addictiveness was arbitrary. *Id.* at 193–95.

**5.** Most cocaine is imported into the United States in its powder form. Crack is made by "cooking" powder with baking soda and water. This is not done by high-level traffickers or importers, but those lower on the chain to whom the drug the drug is distributed for sale. *See United States v. Gunter,* 462 F.3d 237, 240 n. 3 (3d Cir.2006); *Fifteen Years of Guidelines Sentencing* at 132. The result is that street-level crack dealers often get longer sentences than the traffickers or importers who supply them with the powder to produce crack. *See Kimbrough,* 552 U.S. at 98, 128 S.Ct. 558.

20100729–Mark–Osler–The–slow–fade–5874.ece.

This information has been well known for many years, but the pace of reform has been excruciatingly slow. The Sentencing Commission published four reports on the crack/powder issue, each of which systematically explained why the initial justifications for the law were incorrect and strongly urged that Congress reduce the 100:1 ratio. In 2007, the Commission reduced the ratio under the Guidelines from 100:1 to between 25:1 and 80:1. *See Kimbrough,* 552 U.S. at 106, 128 S.Ct. 558; *Amendments to the Sentencing Guidelines for United States Courts,* 72 Fed.Reg. 28,-571–28,572 (May 21, 2007). It applied the new Guidelines retroactively to offenders who had already been sentencing, which resulted in the release of approximately 16,000 federal prisoners. United States Sentencing Commission, *Preliminary Crack Cocaine Retroactivity Data Report,* Table 1 (Sept.2010). That same year, the Supreme Court held that the Sentencing Guidelines were not mandatory, but advisory. *Kimbrough,* 552 U.S. at 108, 128 S.Ct. 558. It noted, however, that while the Anti–Drug Abuse Act of 1986 did not require courts to use the 100:1 ratio when applying the Guidelines, the statutory mandatory minimums were still in effect. *Id.* at 102–03, 128 S.Ct. 558. As a result, massive sentencing disparities remained.

### 4. The Fair Sentencing Act of 2010

Finally, Congress acted. On October 15, 2009, Senator Richard J. Durbin introduced the Fair Sentencing Act ("FSA"). "[W]e have learned a great deal in the last 20 years," he said. "We now know the assumptions that led us to create this disparity were wrong." 155 Cong. Rec. S10491 (daily ed. Oct. 15, 2009) (statement of Sen. Durbin introducing S. 1789). The Act proposed to eliminate the crack/powder disparity and establish a 1:1 sentencing ratio. *See* 155 Cong. Rec. S10488–01

(daily ed. Oct 15, 2009). Senators and Representatives urged that is passage was necessary to correct future sentencings. *See* 155 Cong. Rec. S10491 (daily ed. Oct. 15, 2009) (statement of Sen. Durbin) ("African Americans are incarcerated at nearly six times the rate of White Americans. These are issues of fundamental human rights and justice our country must face. . . . [T]his legislation is about fixing an unjust law that has taken a great human toll."); *id.* (statement of Sen. Sessions) ("I have offered legislation for almost a decade that would substantially improve the sentencing process in a way that I think is fair and constructive. . . . I do think it is past time to act."); 156 Cong. Rec. H6196 (daily ed. July 29, 2010) (statement of Rep. Clyburn) ("Twenty years of experience has taught us that many of our initial beliefs were wrong. We now know that there's little or no pharmacological distinction between crack cocaine and powder cocaine."). It had the support of the Sentencing Commission, which had repeatedly called for drastic reductions in the ratio, and the Department of Justice, which supported the complete elimination of the disparity. *See Restoring Fairness to Federal Sentencing: Addressing the Crack–Powder Disparity: Hearing Before the Subcomm. on Crimes and Drugs of the S. Comm. on the Judiciary,* 111th Cong. 1, 10 (2009) (Statement of Lanny A. Breuer, Assistant Attorney Gen. of the Criminal Division, United States Department of Justice) ("The Administration believes Congress's goals should be to completely eliminate the sentencing disparity between crack cocaine and powder cocaine.").

The resulting Fair Sentencing Act of 2010, however, established an 18:1 crack-to-powder ratio. Although the House Judiciary Committee voted to send the 1:1 ratio to the full House, the Senate Judiciary Committee realized that it could not garner the votes. It sent a compromise bill with an 18:1 ratio and increased penal-

ties for certain conduct to the floor. *See* 156 Cong. Rec. S1680–02, S1680–1681 (statement of Sen. Durbin) ("I wish this bill went further. My initial bill established a 1–to–1 ratio, but this is a good bipartisan compromise."); 156 Cong. Rec. H6197 (statement of Rep. Scott) (noting that the bill is "a bipartisan compromise that was negotiated and drafted by Democratic and Republican members of the Senate Judiciary Committee"). The full Senate unanimously passed the Act on March 17, 2010. On July 28, it passed the House of Representatives by voice vote. And on August 3, 2010, the President signed the FSA into law.

### III. LAW AND ANALYSIS

■ The main issue before the Court is whether the Fair Sentencing Act of 2010, Pub.L. No. 111–220, 124 Stat. 2372 (2010), applies to defendants who committed an offense before the FSA was enacted, but who are sentenced after. The FSA replaced the triggers for the mandatory minimum punishments in crack cocaine offenses. Previously, the ratio between crack and powder had been 100:1; quantities of five and fifty grams of crack led to mandatory minimums of five and ten years, respectively. Under the FSA, the ratio was lowered to 18:1. Thus the triggers are now twenty-eight and two-hundred-eighty grams. The thresholds for powder cocaine remain at five-hundred and five-thousand grams. *See* 21 U.S.C. § 841(b)(1)(A)(ii) (powder cocaine), (b)(1)(A)(ii) (crack cocaine), (b)(1)(B)(ii) (power cocaine), (b)(1)(B)(iii) (crack cocaine).

In addition, the FSA directed the Sentencing Commission to adopt guidelines on an emergency basis that conformed to the FSA. *See* FSA § 8. The new guidelines took effect on November 1, 2010. *See* United States Sentencing Commission, *Supplement to the 2010 Guidelines Manual,* Supplement to the 2010 Supplement to Appendix C, Amendment 748 (Nov. 1, 2010).

As Shull has yet to be sentenced, the Court is presented with two questions. First, whether the new Guidelines apply, and second, whether, by implication or otherwise, the FSA's new mandatory minimums apply as well.

The government argues that *United States v. Carradine,* 621 F.3d 575 (6th Cir.2010), forecloses the application of both the amended guidelines and the new mandatory minimums. In that case, the Sixth Circuit found that the FSA was not retroactive; a defendant convicted and sentenced before the FSA was enacted could not be resentenced according to its provisions. *Id.* at 580. Previously, this Court relied on *Carradine* to find that the FSA did not apply to Shull. He now requests that the Court reconsider this decision because his situation is different from that of Carrardine. Carrardine had been sentenced before the FSA was enacted; Shull awaits sentencing post-FSA.[6] *Carradine* does not address this post-FSA situation, and thus the Court is compelled to reconsider its prior order.[7] *See United States v.*

---

**6.** Shull appears before this Court on general remand for de novo resentencing. In other words, the Court must start fresh and redo the entire sentencing process. *See United States v. Moored,* 38 F.3d 1419, 1422 (6th Cir.1994) (stating that "absent explicit limitations in the appellate court's mandate, an order vacating a sentence and remanding the case for resentencing directs the sentencing court to begin anew, so that fully de novo

resentencing is entirely appropriate") (internal quotations omitted).

**7.** At the time of this writing, eleven circuit courts have held that the FSA does not apply to defendants who were sentenced under the prior statute and Guidelines, before the effective date of the FSA. These Courts held that the General Saving Statute, 1 U.S.C. § 109, barred the retroactive application of the FSA.

*Gillam,* 753 F.Supp.2d 683, 687 (W.D.Mich.2010) (finding that *Carradine* did not apply to not yet sentenced defendants). After considering the text and purpose of the FSA, as well as the case law that has developed, the Court now holds that the FSA is applicable to Shull's sentencing.

## A. AMENDED GUIDELINES

■■■ The question as to whether the amended guidelines apply is an easy one. The Sentencing Reform Act of 1984 expressly states that the applicable Guidelines are those in effect at the time of the defendant's sentencing. 18 U.S.C. § 3553(a)(4)(A)(ii). Thus, a sentencing court will apply the Guidelines in force at sentencing unless they raise *ex post facto* problems. *United States v. Lanham,* 617 F.3d 873, 889 (6th Cir.2010). The ex post facto clause of the Constitution, Art. 1 § 9, cl. 3, "forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred." *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981). The clause does not prohibit the use of amended Guidelines that lighten the applicable penalties, as with the new crack-to-powder ratio.

Per Congress's directive, the amended Guidelines came into effect approximately eight months ago, on November 1, 2010. In the FSA, Congress explicitly ordered the Sentencing Commission to draft Guidelines that conformed to the new 18:1 ratio as soon as practicable or within 90 days of the statute's enactment. This immediacy was necessary so that the Guidelines were consistent with "applicable law," i.e., the new mandatory minimums. FSA § 8. Thus, consistent with Sixth Circuit precedent, the Guidelines provisions of the FSA have been in effect since their effective date of November 1, 2010. As these Guidelines ameliorate the punishments for crack cocaine offenses, they raise no *ex post facto* issues. Accordingly, there is no bar to their application to pending cases. *See United States v. Douglas,* 644 F.3d 39, 41–42, 2011 WL 2120163, at *2 (1st Cir. 2011) (finding that FSA-ordered Guidelines apply to all defendants sentenced after November 1, 2010); *United States v. Watts,* 775 F.Supp.2d 263, 273, 2011 WL 1282542, at *9 (D.Mass.2011) ("In assessing congressional intent ... if this case were strictly controlled by the Sentencing Guidelines, there would be no question that [the defendant] would be sentenced under the new Guidelines as dictated by the FSA, even though he committed his crime prior to the effective date of the new law."). Logically, there is no reason why the Guideline amendments should apply,

*See United States v. Goncalves,* 642 F.3d 245, 254 n. 8 (1st Cir.2011) (collecting cases). These decisions, however, do not address the situation currently before the Court: a defendant whose culpable conduct occurred prior to the enactment of the FSA, but whose sentencing will occur after. Thus, they are not persuasive authority that the FSA should not apply to Shull. Few circuit courts have considered this issue. The First and Eleventh Circuits have held that the FSA applies to defendants not yet sentenced, like Shull. *United States v. Vera Rojas,* No. 10–14662, 645 F.3d 1234, 2011 WL 2623579 (11th Cir. July 6, 2011); *United States v. Douglas,* 644 F.3d 39, 2011 WL 2120163 (1st Cir.2011).

The Seventh Circuit, however, held that it does not. *United States v. Fisher,* 646 F.3d 429, 2011 WL 2022959 (7th Cir.2011). District Courts are divided. *See United States v. Green,* No. 6:08–cr–270 (M.D.Fl. Jan. 1, 2011) (collecting cases). In the Sixth Circuit, several District Court Judges have ruled that the FSA applies to defendants in Shull's position. *See Gillam,* 753 F.Supp.2d at 690; *United States v. Franklin,* No. 10–20467, 2011 WL 346085 (E.D.Mich. Feb. 3, 2011); *United States v. Robinson,* 763 F.Supp.2d 949 (E.D.Tenn.2011); *United States v. Gibson,* No. 1:08–CR–123 (S.D.Ohio Apr. 14, 2011); *United States v. Freeman,* No. 2–10–CR–029 (S.D. Ohio June 2, 2011).

but the statutory minimums that Congress mandated them to conform to should not. Fortunately for Shull, he has not just logic, but the law, on his side.

### B. MANDATORY MINIMUMS

The next issue is whether the mandatory minimums in the FSA apply to Shull. An analysis of the text and purpose of the statute, as well as the Saving Statute, reveals that Congress intended for the FSA to apply to all pending cases.

#### 1. Text, Structure, and Context

In order to determine if Congress intended for a statute to apply to pending cases, traditional principles of statutory construction apply. These include examining the explicit language of the statute and the context of the statute as a whole. *See Lindh v. Murphy*, 521 U.S. 320, 325–26, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Looking first to the text of the FSA, its Preamble states that the goal of the statute is to "restore fairness to Federal cocaine sentencing." FSA, Preamble. The directives of the Act focus in on this goal. Congress provided the Sentencing Commission with emergency authority to adopt amendments that conformed to the statute "as soon as practicable, and in any event not later than 90 days" after enactment. FSA § 8. In other words, Congress directed the Sentencing Commission to revise downward the sentencing Guidelines for crack offenses so that they were consistent with the new 18:1 ratio. It is simply inconceivable that Congress would expressly insist on the immediate drafting of new Guidelines in order to establish conformity with the statute, yet allow mandatory minimums that it has identified as unfair and unjust to continue. The statute of limitations for the relevant crack offenses is five years. It would be patently absurd if courts were required to sentence defendants culpable of pre-November 1, 2010 conduct under the 100:1 mandatory minimums until 2015. This inconsistency

would frustrate Congress's will, render the new Guidelines effectively meaningless, and defeat the very purpose of the FSA. *See United States v. American Trucking Ass'ns*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940) (explaining that when a court is construing a statute, it should prevent absurd results and constructions that are inconsistent with the policy of the statute as a whole).

As the text and structure of the FSA clearly direct that it should apply immediately, it is not necessary to consider the legislative history. A review of the Senate and House records, however, reinforces Congress's push for urgency in sentencing reform. Members of both houses repeatedly stated that the purpose of the FSA was to remedy past injustices and ensure fairer sentencing in the future. *See, supra*, II. B.4. The lead sponsors of the FSA stressed the necessity of its immediate application to pending sentencings in a letter to the Attorney General dated November 17, 2010, writing: "we ... urge you to apply [the FSA's] modified mandatory minimums to all defendant's who have not yet been sentenced, including those whose conduct predates the legislation's enactment." Letter from Senators Dick Durbin and Patrick J. Leahy to Attorney General Eric Holder, November 17, 2010. In sum, the language and history of the FSA show that Congress's intent was to put the amended Guidelines and mandatory minimums in effect as soon as possible.

#### 2. The Saving Statute

■ The FSA does not expressly address whether it applies to pending cases. Due to the absence of this explicit language, the government argues that the Saving Statute, 1 U.S.C. § 109, "saves" the old mandatory minimums and prohibits the application of the FSA's mandatory minimums to Shull. A thorough review of the history, language, and purpose of this stat-

ute, however, demonstrates that the Saving Statute should not be applied so rigidly to the case *sub judice:* the Saving Statute does not apply if it frustrates congressional intent as evidenced either by express declaration or necessary implication in the new or amended statute.

In 1870, a seaman known as Tynen was charged with using a forged certificate of citizenship, in violation of "the Act of 1813." *United States v. Tynen,* 78 U.S. 88, 89–90, 11 Wall. 88, 20 L.Ed. 153 (1870). After he was indicted, but before the trial, Congress passed an act—The Act of 1870—that amended the statutory penalties for the offense. While the Act of 1870 did not expressly repeal the Act of 1813, the Supreme Court held that it effectively operated as a repeal. Because the common law presumption was that the substitution of new penalties or the repeal of a criminal statute abated all ongoing proceedings, the Supreme Court remanded the case to the lower court to dismiss the indictment. *Id.* at 95.

Congress responded with the enactment of its first Saving Statute, c. 71, 16 Stat. 432 (1871). *See Warden, Lewisburg Penitentiary v. Marrero,* 417 U.S. 653, 660, 94 S.Ct. 2532, 41 L.Ed.2d 383 (stating that Congress enacted the Saving Statute "to abolish the common-law presumption that the repeal of a criminal statute resulted in the abatement of 'all prosecutions which had not reached final disposition in the highest court authorized to review them.'") (quoting *Bradley v. United States,* 410 U.S. 605, 607, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973)). Congress codified the statute in 1947, and the relevant clause now provides:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

1 U.S.C. § 109 (1947).

The Supreme Court has said that the Saving Statute should not be given effect if contrary legislative intent exists. In other words, the Statute "cannot justify a disregard of the will of Congress as manifested, either expressly or by necessary implication, in a subsequent enactment." *Great No. Ry. Co. v. United States,* 208 U.S. 452, 465, 28 S.Ct. 313, 52 L.Ed. 567 (1908); *see also Hertz v. Woodman,* 218 U.S. 205, 217, 30 S.Ct. 621, 54 L.Ed. 1001 (1910) (noting that the Saving Statute is a "rule of construction ... to be read and construed as part of all subsequent repealing statutes, in order to give effect to the will and intent of Congress."). If an act of Congress contains a "specific directive" that "can be said by fair implication or expressly to conflict with § 109," then the act supersedes the Saving Statute. *Warden, Lewisburg Penitentiary v. Marrero,* 417 U.S. 653, 659–60 n. 10, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974). A necessary or fair implication "aris[es] from the terms of the law as a whole," and makes clear that "the legislative mind will be set at naught by giving effect to" the Saving Statute. *Great No. Ry. Co.,* 208 U.S. at 465, 28 S.Ct. 313; *see also Lockhart v. United States,* 546 U.S. 142, 148, 126 S.Ct. 699, 163 L.Ed.2d 557 (noting that Congress may "make its will known in whatever fashion it deems appropriate," either expressly or by necessary or fair implication, "that is, *without* an express statement.") (Scalia, J., concurring).

### 3. Application of the Saving Statute to the FSA

■ Applying this standard to the case *sub judice,* it is clear that the Saving Statute does not foreclose the application of

the FSA to pending cases. The text of the FSA and the context of its passage convey a specific directive that the amended mandatory minimums should apply to all new sentences. *See Douglas,* 644 F.3d at 42–44, 2011 WL 2120163, at *3–4 (holding that the FSA supersedes the Saving Statutes and applying the FSA's modified mandatory minimums to all defendants not yet sentenced on November 1, 2010); *Watts,* 775 F.3d at 278–79, 2011 WL 1282542, at *14 (same). Their immediate application is the only way to satisfy Congress's explicit instruction to "restore fairness" to crack sentencing and maintain consistency with the Guidelines.

The application of the FSA to pending cases is consistent with the purpose of the Saving Statute, which was not intended to hinder the application of ameliorative sentencing amendments, but to prevent "technical" abatements such as those involving seaman Tynen. *See Hamm v. Rock Hill,* 379 U.S. 306, 314, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964) (finding that the federal Saving Statute was intended to eliminate technical abatements, not hinder amelioration). In other words, it was enacted to avoid the termination of pending prosecutions when a statute was repealed. *See Marrero,* 417 U.S. at 665, 94 S.Ct. 2532 (noting that the Saving Statute "has never been applied by this Court other than to prevent technical abatement of a prosecution."). This case does not involve technical abatements, and so the history and purpose of the Saving Statute further counsel against its application.

The government relies on *Marrero* to argue that the Saving Statute should apply. In that case, the Supreme Court addressed the retroactivity of a statute that created parole eligibility for serious drug offenders, overturning a prior statute that rendered them ineligible. The Court held that the new statute's own saving clause barred the application of that stat-

ute to the defendant, and thus he could not benefit from the new penalties. 417 U.S. at 657–58, 94 S.Ct. 2532. In the alternative, the Court found that the new statute technically abated the defendant's conviction and sentence, *id.* at 660 n. 11, 94 S.Ct. 2532, and thus the Saving Statute was needed to "save" his penalty under the prior statute. *Id.* at 663–64, 94 S.Ct. 2532. Neither of these holdings advances the government's argument. The statute at issue in *Marrero* contained its own saving clause that sought to save the harsher penalty. By contrast, the FSA not only contains no such provision, but expressly grants the Sentencing Commission emergency authority to draft Guidelines amendments that corresponded to the new mandatory minimums. *See* FSA § 8. Further, the Court's alternative holding reinforces the Saving Statute's underlying premises: first, congressional intent must be adhered to, and second, the statute is intended to prevent technical abatements.

Finally, it is generally understood that an earlier Congress cannot bind a later Congress. The Saving Statute cannot be read in such a way that it allows the technical requirements of an earlier Congress to restrict the acts of a subsequent Congress. To insist on express statements, as the government urges, would require Congress to use the "magical passwords" that the Supreme Court has repeatedly decried and threaten to frustrate legislative will. *See Lockhart,* 546 U.S. at 145, 126 S.Ct. 699. In *Lockhart,* for example, Justice Scalia wrote that Congress's requirement of express statements places an unnecessary "burden [on] the future exercise of legislative power." *Id.* at 149, 126 S.Ct. 699 (concurring opinion). These technical requirements, he wrote, should not prevent Congress from acting. As he explained, "[w]hen the plain import of a later statute directly conflicts with an earlier statute, the later enactment governs,

regardless of its compliance with any earlier-enacted requirement of an express reference." *Id.* In this case, Congress's intent is easily discernible from the text, structure, and history of the FSA. The Act contains a clear and specific directive; an express statement would be redundant. Congress intended for the new mandatory minimums to apply as soon as possible.

\* \* \*

In passing the FSA, Congress began to correct the failures of the Anti–Drug Abuse Act of 1986. It acknowledged that the premise of the 1986 Act was factually flawed and its impact racially skewed. The government argues that this Court should continue to apply these misguided mandatory minimums even after Congress has recognized their injustice. As set forth above, principles of law, reason, and fairness render this a position that the Court cannot accept. Congress has identified a remedy. The President has signed it into law. This Court will apply the Fair Sentencing Act, both its amended Guidelines and mandatory minimums, to Robert Shull.

## IV. THE SENTENCE

Having determined that the FSA applies, the Court will now turn to the sentence it intends to impose. In *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the Supreme Court rendered the Sentencing Guidelines advisory. The Guidelines are now "one factor among several courts must consider in determining the appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 90, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007). Although the guidelines are no longer mandatory, the Supreme Court has instructed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007) (citing *Rita v. United States*, 551 U.S. 338, 347–48, 127

S.Ct. 2456, 168 L.Ed.2d 203 (2007)). After determining the Guidelines range, district courts are obligated to consider the sentencing factors set forth in 18 U.S.C. § 3553(a)(1) in light of the defendant's individual facts and circumstances. *Gall*, 552 U.S. at 48–51, 128 S.Ct. 586.

## A. GUIDELINES CALCULATION AND APPLICABLE MANDATORY MINIMUM

The probation officer determined that if the FSA applies, Shull's criminal history category is III, and the offense level is 26. U.S.S.G. § 2D1.1(c)(J). Inasmuch as the Court finds that the FSA does apply, it will utilize these calculations. The Guidelines imprisonment range for the combination of criminal history category III and offense level 26 is 78 to 97 months. Under the FSA, the mandatory minimum in this case is sixty months. FSA § 2; 18 U.S.C. § 841(a)(1) and (b)(1)(a)(iii).

## B. SECTION 3553(A) FACTORS

The basic mandate of § 3553(a) requires a district court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the four purposes of sentencing set forth in § 3553: retribution ("to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"), deterrence ("to afford adequate deterrence to criminal conduct"), incapacitation ("to protect the public from further crimes of the defendant"), and rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"). 18 U.S.C. § 3553(a)(2). These four principles can be traced back to historical theories of punishment, and serve as the guiding values and goals in sentencing. Thus, this "parsimony provision" functions as a theoretical

limit on what kind of sentence the Court may impose.

In determining whether a sentence is sufficient, but not greater than necessary, the Court must consider the five factors set forth in § 3553(a): (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, provide just punishment, and deter criminal conduct; (3) the kinds of sentences available; (4) the need to avoid unwarranted sentence disparities; and (5) the need to provide restitution to the victims.

First, the Court must consider the nature and circumstances of the offense and the history and characteristics of the defendant. Taking the nature and circumstances of the events first, Shull was a passenger in a car in which 52.9 grams of crack cocaine were discovered. No firearms were present, and no violence occurred in connection with the drug offense.

As to his individual characteristics, Shull is now 30 years old. He grew up in Columbus, Ohio in a typical two-parent home. Never married, Shull has six children and has good relationships with each of his children and their mothers. Like most drug offenders, he has a past history of substance abuse. He has taken steps to address this issue by completing a Drug Education Program. Shull did not complete high school, but he did obtain his GED. In a letter to the Court, Shull wrote that he has now committed himself to academic and vocational training. He has taken several vocational courses, and obtained the National HVAC Excellence Certification in air conditioning and in HVAC Electrical. He successfully completed the EPA class on safe handling of refrigerants and the Green Mechanical Awareness Exam. In addition, he earned the OHSA 10–hours General Industry Safety Card. Shull is now enrolled in Glenville State College taking business classes, and the Court hopes that he will continue his educational pursuits throughout the remainder of his term and upon his release.

Second, the sentence imposed must reflect the seriousness of the offense, provide just punishment, and deter criminal conduct. As to the seriousness of the offense, crack cocaine is a very dangerous drug, but there is nothing about the conduct at issue here that renders this story unique. Shull's case is that of another drug user without an education or a job who started selling drugs. Congress has determined that a mandatory minimum of five years is the appropriate punishment for this type of low-level dealer, and the Court is bound to follow. The Court hopes that this sentence will impress on Shull the necessity of reforming his lifestyle, and will encourage others not to follow his path, but to stay in school, work hard, and find a job.

Third, the Court is required to consider the kinds of sentences available, including non-incarceration alternatives. This factor is easy to dispense with, as incarceration is mandated in this case.

Fourth, the Court is obligated to fashion a sentence for Shull in line with the sentences that similarly situated offenders have received, both in this case and in other cases. The government argues that Shull must be sentenced in a manner that is consistent with his co-defendant, Antwan Lewis. Following the guilty verdict in Shull's case, Lewis pled guilty to the two counts in the indictment and was sentenced to 120 months. While the Court understands the government's concern, its argument is unpersuasive for two reasons. First, Lewis pled guilty to two counts: conspiracy and possession with intent to distribute. Shull appears before this Court only on the intent to distribute count. Second, at Lewis's sentencing, the Court was constrained by the ten-year

mandatory minimum. As discussed extensively above, Congress has reduced the applicable minimum to five years. A sentence of 120 months—simply to remain consistent with a co-defendant convicted of an additional count—is significantly above the Guidelines in this case and relies on an outdated ratio that Congress has explicitly identified as unjust and unfair. This Court will sentence Shull in a manner that is consistent with Congress's directive in the FSA, as that has been the benchmark in crack offenses since November 1, 2010.

## C. IMPOSITION OF SENTENCE

 After considering the § 3553(a) factors—particularly Shull's personal efforts to obtain an education and his role at the bottom of the drug hierarchy—as well as the history of crack cocaine sentencing, the Court finds that a variance from the advisory Guidelines range is warranted. The recommended sentence is based on an 18:1 ratio, which is a compromise position that does not fully remedy the problems posed by the crack/powder disparity. As explained in great detail above, the disparity: (1) is not supported by the evidence of relative harmfulness and addictiveness between crack and powder; (2) punishes low-level dealers of crack like Shull more harshly than high-level traffickers of other drugs; (3) uses a quantity ratio as a proxy for violence and weapons, neither of which are at all relevant to this case; and (4) continues to foster disrespect for the criminal justice system because it disproportionately impacts African American defendants like Shull. If the crack-to-powder ratio were 1:1, the Guidelines would be 27–33 months, as opposed to 78–98 months. The Court sees no justification for the difference in this case, or in general. *See United States v. Williams,* 788 F.Supp.2d 847, 891–92, 2011 WL 1336666, at *41–42 (N.D.Iowa April 7, 2011) (adopting 1:1 ratio); *United States v. Whigham,* 754

F.Supp.2d 239, 247 (D.Mass.2010) (adopting 1:1 ratio).

Nevertheless, the Court is required to impose a mandatory minimum in this case. Accordingly, pursuant to the Sentencing Reform Act of 1984 and 18 U.S.C. § 3553(a), it is the judgment of the Court that the defendant, Robert H. Shull, is sentenced to 60 months on Count 1.

**IT IS SO ORDERED.**